1
2
3
4
5
6
7

8          UNITED STATES DISTRICT COURT

9        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CHEVRON ENVIRONMENTAL              No.  1:19-cv-00807-NONE-JLT
     MANAGEMENT COMPANY, A
12   CALIFORNIA CORPORATION, *et al.*,  ORDER DENYING NONPARTIES' MOTION
                                        TO INTERVENE UNDER FED. R. CIV. P. 24
13                 Plaintiffs,
                                        (Doc. Nos. 25, 27)
14        v.

15   ENVIRONMENTAL PROTECTION
     CORPORATION,
16
                   Defendant.
17

18          Before the court for consideration is a motion to intervene in this action brought by

19   nonparty National Union Fire Insurance Company of Pittsburg, P.A. ("National Union") on

20   November 15, 2019.  (Doc. No. 25.)  That motion was joined[1] seven days later by another

21   nonparty, North Star Reinsurance Corporation ("North Star").  (Doc. No. 27.)  Both the motion to

22   intervene and the joinder were filed over one month after a default judgment was entered against

23   the prospective intervenors' insured, defendant Environmental Protection Corporation

24   ("defendant"), and in favor of plaintiffs Chevron Environmental Management Company and

25   _____

26   [1]  For purposes of efficiency, North Star agreed to have National Union take the lead and file the
     instant motion to intervene with North Star filing a joinder in that motion.  (Doc. No. 27 at ¶¶ 7-
27   8.)  The joinder states that North Star is joining "all arguments and authorities" provided by
     National Union.  (*Id.* at ¶ 8.)  The court, therefore, construes all arguments made in the motion to
28   intervene by National Union as also being made on behalf of North Star.

1

1   Chevron U.S.A. Inc. (collectively, "plaintiffs"). (Doc. No. 23.) National Union and North Star

2   (collectively, "prospective intervenors") assert that they are successors in interest to nonparties

3   Landmark Insurance Company ("Landmark") and New Hampshire Insurance Company

4   ("NHIC"), which issued the liability insurance policy covering defendant's purported misconduct

5   in this action. (Doc. Nos. 25-1 (Poppler Decl.) at ¶ 1; 27-1 (Willis Decl.) at ¶ 2.) Prospective

6   intervenors seek to intervene in this action as a matter of right or, in the alternative, for permissive

7   intervention under Federal Rule of Civil Procedure 24(a)-(b) to defend their interests in

8   defendant's insurance policy and to seek relief from the default judgment. (Doc. Nos. 25 at 2-3;

9   27 at ¶¶ 6-9.) On December 2, 2019, plaintiffs opposed the motion to intervene and joinder on

10   the ground of untimeliness, to which National Union replied on December 9, 2019. (Doc. Nos.

11   28 at 2, 7-10; 29.)

12       The matters were taken under submission on the papers pursuant to Local Rule 230(g).

13   (Doc. No. 30.) Having read and considered the parties' arguments, the motion to intervene filed

14   on behalf of National Union and North Star will be denied as untimely.

15                                    **BACKGROUND**

16       Plaintiffs brought this action against defendant for violation of the Comprehensive

17   Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") and for

18   contribution and/or indemnity under the California Health and Safety Code §§ 25325.5, 25363(e).

19   (Doc. No. 1 at ¶ 1.) Defendant allegedly operated a waste disposal facility in an area northeast of

20   Bakersfield, California and caused hazardous substances to be released from the facility into the

21   environment from 1970 to 1992. (*Id.* at ¶¶ 1, 8-10.) As a result, plaintiffs incurred expenses to

22   clean up the hazardous substances and brought this action to recover the costs of that cleanup.

23   (*Id.* at ¶¶ 15, 17, 23, 28.)

24   /////

25   /////

26   /////

27   /////

28   //////

By the time this action was brought against defendant, its corporate status was in suspension.  (*Id.* at ¶ 6; *see also* Doc. No. 26, Ex. A.)[2]  Under California law, a "corporation that has had its powers suspended lacks the legal capacity to prosecute or defend a civil action during its suspension."  *Casiopea Bovet, LLC v. Chiang*, 12 Cal. App. 5th 656, 662 (2017) (internal quotation marks omitted) (citing Cal. Rev. & Tax. Code § 23301).  Defendant did not defend itself in this action.  As a consequence, the previously assigned district judge entered default judgment on October 2, 2019 against defendant and awarded plaintiffs approximately $18.15 million in damages.  (Doc. Nos. 22, 23.)

## LEGAL STANDARD

An individual may "become a 'party' to a lawsuit by intervening in the action."  *U.S. ex rel. Eisenstein v. City of New York, N.Y.*, 556 U.S. 928, 933 (2009).  Intervention in federal court, either as of right or permissive, is governed by Federal Rule of Civil Procedure 24.  *Nat'l Ass'n for Advancement of Colored People v. N.Y.*, 413 U.S. 345, 365 (1973) ("*NAACP*").  Rule 24 provides in relevant part as follows:

> (a) Intervention of Right. On timely motion, the court must permit anyone to intervene who:
>
>> (1) is given an unconditional right to intervene by a federal statute; or
>>
>> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.
>
> (b) Permissive Intervention.
>
>> (1) In General. On timely motion, the court may permit anyone to intervene who:

---

[2]  National Union asks the court to take judicial notice of a "screenshot from the California Secretary of State's business search for 'Environmental Protection Corporation'" showing that defendant's corporate status has been suspended.  (Doc. No. 26 at ¶ 1.)  Plaintiffs do not dispute the fact that defendant's corporate status has been suspended.  (*See* Doc. No. 28.)  The court therefore takes judicial notice of this fact under Federal Rule of Evidence 201(b) because it is not subject to reasonable dispute and the accuracy of the screenshot cannot reasonably be questioned.  *See United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003).

1

> (A) is given a conditional right to intervene by a federal statute; or

2

3

> (B) has a claim or defense that shares with the main action a common question of law or fact.

4

* * *

5

6

> (3) Delay or Prejudice. In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

7   Here, although prospective intervenors alternatively seek permissive intervention under

8   Rule 24(b), the resolution of the motion to intervene before this court is dependent on whether the

9   prospective intervenors have satisfied the requirements to intervene as of right under Rule

10  24(a)(2)—an easier standard to satisfy in this particular case where timeliness is at issue.  (Doc.

11  Nos. 25 at 5-9; 27 at ¶ 8; 28 at 7-10); *see also League of United Latin Am. Citizens v. Wilson*, 131

12  F.3d 1297, 1308 (9th Cir. 1997) ("*Wilson*") ("In the context of permissive intervention, however,

13  we analyze the timeliness element more strictly than we do with intervention as of right.").  In

14  this regard, it is well-established that intervention as of right under Rule 24(a)(2) is construed

15  "liberally in favor of potential intervenors."  *Cal. ex rel. Lockyer v. United States*, 450 F.3d 436,

16  440 (9th Cir. 2006) (citation omitted); *see also United States v. Alisal Water Corp.*, 370 F.3d 915,

17  919 (9th Cir. 2004).

18      Rule 24(a)(2) requires a prospective intervenor to establish the following elements:

19

> (1) the intervention application is timely; (2) the applicant has a significant protectable interest relating to the property or transaction that is the subject of the action; (3) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the existing parties may not adequately represent the applicant's interest.

20

21

22

23  *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011)

24  (internal quotation marks and citation omitted); *see also Smith v. Los Angeles Unified School*

25  *District*, 830 F.3d 843, 853 (9th Cir. 2016).  In evaluating these elements, the court is "guided

26  primarily by practical considerations, not technical distinctions," and no "specific legal or

27  equitable interest need be established."  *Id.*  Moreover, the court must "take all well-pleaded,

28  nonconclusory allegations in the motion to intervene, the proposed complaint or answer in

4

1   intervention, and declarations supporting the motion as true absent sham, frivolity or other

2   objections." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001).

3                                          **ANALYSIS**

4          The primary issue the court must resolve here is whether the motion to intervene is timely.

5   *See United States v. Union Elec. Co.*, 64 F.3d 1152, 1159 (8th Cir. 1995) ("If the applicant's

6   motion to intervene was not timely filed, the applicant is barred from intervening.").  "The *crucial*

7   *date* for assessing the timeliness of a motion to intervene is when proposed intervenors *should*

8   *have* been aware that their interests would not be adequately protected by the existing parties."

9   *Smith*, 830 F.3d at 854 (emphasis added) (quoting *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir.

10  1999)).  The determination of the crucial date in this case turns on whether prospective

11  intervenors received multiple sets of notices or letters sent by plaintiffs about this action:  if

12  prospective intervenors received the first set of letters providing notice of this action, then the

13  instant motion is untimely; if not, then the question of timeliness becomes debatable and hinges

14  on the receipt of the other subsequent notices sent by plaintiffs.  Plaintiffs first sent letters, dated

15  June 17, 2019 (ten days after this action was filed), to prospective intervenors National Union and

16  North Star, as well as their predecessors Landmark and NHIC, to inform them of this action and

17  to make a claim under defendant's insurance coverage.  (Doc. Nos. 28-2 at 2; 28-3 at 2; 28-6 at 2;

18  28-7 at 2.)  The letters were sent through the U.S. Postal Office ("USPS") with return receipt

19  requested.  (*Id.*)  Only the June 17, 2019 letter to Landmark, however, was returned by the USPS

20  as undeliverable, so plaintiffs sent another letter to Landmark on July 11, 2019, which was again

21  returned by USPS as undeliverable.  (Doc. Nos. 28-7, 28-8.)  Accordingly, on September 11,

22  2019, plaintiffs forwarded the July 11, 2019 letter to prospective intervenor National Union.

23  (Doc. No. 28-9.)  Then, six days after the default judgment was entered in this action, plaintiffs

24  sent a second set of letters, dated October 9, 2019 to National Union, North Star, and NHIC,

25  informing them of the default judgment.  (Doc. Nos. 28-12, 28-13, 28-14.)  In November 2019,

26  five months after plaintiffs had sent the first set of letters in June 2019, prospective intervenors

27  sought to intervene in this action.  (Doc. Nos. 25, 27.)

28  /////

                                                5

1     **A.      Request to Intervene as of Right**

2            1.      Timeliness

3            "Timeliness is 'the threshold requirement' for intervention as of right.  In other words, if

4    we find 'that the motion to intervene was not timely, [we] need not reach any of the remaining

5    elements of Rule 24.'"  *Wilson*, 131 F.3d at 1302 (citations omitted).  The Ninth Circuit has held

6    that timeliness is determined based upon consideration of three factors:

7                    "(1) the stage of the proceeding at which an applicant seeks to
                     intervene; (2) the prejudice to other parties; and (3) the reason for
8                    and length of the delay."  In analyzing these factors, however, courts
                     should bear in mind that "[t]he *crucial date* for assessing the
9                    timeliness of a motion to intervene is when proposed intervenors
                     *should* have been aware that their interests would not be adequately
10                   protected by the existing parties."

11   *Smith*, 830 F.3d at 854 (emphasis added) (citations omitted); *see also Wallach v. Eaton Corp.*,

12   837 F.3d 356, 371 (3d Cir. 2016) (explaining that the "three factors are necessarily bound up in

13   one another").  "Timeliness is a flexible concept," *Alisal Water Corp.*, 370 F.3d at 921, and the

14   "inquiry is inherently fact-sensitive and depends on the totality of the circumstances," *R & G*

15   *Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*, 584 F.3d 1, 7 (1st Cir. 2009).  The "[m]ere lapse

16   of time alone is not determinative." *United States v. State of Oregon*, 745 F.2d 550, 552 (9th Cir.

17   1984); *see also Smith*, 830 F. 3d at 854.  Below the court will consider each of these factors in

18   turn.

19                    a.      *Stage of Proceeding*

20           The "stage of the proceedings" factor focuses on "what had already occurred" by the time

21   prospective intervenors sought intervention.  *Wilson*, 131 F.3d at 1303.  Here, National Union's

22   motion to intervene and North Star's joinder therein were brought 41 days and 48 days,

23   respectively, after the entry of default judgment.  (*See* Doc. Nos. 23, 25, 27.)  Relying on the

24   decision in *U.S. ex rel. McGough v. Covington Techs. Co.*, 967 F.2d 1391 (9th Cir. 1992)

25   ("*Covington*"), plaintiffs contend that prospective intervenors' "right to intervene is not available

26   since judgment is final and non-appealable" after 30 days from the entry of default judgment

27   /////

28   /////

1    under Federal Rule of Civil Procedure 4.[3]  (Doc. No. 28 at 7.)  This, however, is an overstatement

2    of the holding in *Covington*.  There, the court did acknowledge "[t]he general rule [is] that a post-

3    judgment motion to intervene is timely if filed within the time allowed for the filing of an

4    appeal."  *Covington*, 967 F.2d at 1394.  But that is only a "general rule," not a dispositive one.

5    *See, e.g.*, *Floyd v. City of New York*, 302 F.R.D. 69, 85 (S.D.N.Y. 2014) ("This is a fundamental

6    misstatement of the case law on post-judgment intervention, which focuses on actual or

7    constructive notice, not a rigid thirty-day rule.").  As the Supreme Court has instructed,

8    "[a]lthough the point to which the suit has progressed is one factor in the determination of

9    timeliness, it is not solely dispositive."  *NAACP*, 413 U.S. at 365–66.  Indeed, "nothing in Rule

10    24(a) precludes postjudgment or even post-appeal intervention."  *Tweedle v. State Farm Fire &*

11    *Cas. Co.*, 527 F.3d 664, 671 (8th Cir. 2008).

12          Nevertheless, "such postjudgment intervention is generally disfavored because it creates

13    'delay and prejudice to existing parties.'"  *Calvert v. Huckins*, 109 F.3d 636, 638 (9th Cir. 1997)

14    (citation omitted).  While not going so far as to adopt plaintiffs' position that it is prohibited, the

15    undersigned does acknowledge that postjudgment intervention (made here after the 30-day

16    deadline to appeal) is strongly disfavored.  *E.g.*, *Houston Gen. Ins. Co. v. Moore*, 193 F.3d 838,

17    840 (4th Cir. 1999) ("'There is considerable reluctance on the part of the courts to allow

18    intervention after the action has gone to judgment and a strong showing will be required of the

19    applicant.'"); *Gaboratory, Inc. v. Gaboratory Int'l, Inc.*, No. CV 07-04725 MMM (EX), 2008

20    WL 11406057, at *4 (C.D. Cal. Oct. 20, 2008) (finding that a motion to intervene brought after

21    the entry of default judgment is strongly disfavored).  Because here the motion to intervene and

22    joinder therein were brought weeks after the time to appeal the default judgment had passed,

23    consideration of the "stage of the proceedings" factor strongly disfavors the granting of

24    intervention.

25    /////

26

27    [3]  "Federal Rule of Appellate Procedure (FRAP) 3 and 4 state that a party wishing to appeal from the district court to the court of appeals must file a notice of appeal with the district court within 30 days after the judgment or order appealed from is entered."  *Cruz v. Int'l Collection Corp.*, 673

28    F.3d 991, 1001 (9th Cir. 2012) (footnote omitted).

b.      *Prejudice to Plaintiffs*

The Ninth Circuit has held that "prejudice to existing parties is 'the most important consideration in deciding whether a motion for intervention is untimely.'"  *Smith*, 830 F.3d at 857 (quoting *State of Or.*, 745 F.2d at 552).  Thus, in assessing prejudice, the Ninth Circuit has emphasized that

> the *only* "prejudice" that is relevant under this factor is that which flows from a prospective intervenor's failure to intervene *after* he knew, or reasonably should have known, that his interests were not being adequately represented—and not from the fact that including another party in the case might make resolution more "difficult[ ]."

*Id.* (emphasis added).  Contrary to the prospective intervenors' argument that their "knowledge of the lawsuit is almost irrelevant," (Doc. No. 29 at 6), the holding in *Smith* makes clear that *when* prospective intervenors learned[4] or should have learned[5] about their interest in defending defendant is fundamental to the assessment of prejudice.

Prospective intervenors argue that no party to this action will experience any prejudice if they are permitted to intervene, and that they "only became aware of the necessity to intervene" on September 13, 2019 when "default judgment was ordered" by the magistrate judge.  (Doc. No. 25 at 5, 7.)[6]  If prospective intervenors only became aware when the default judgment was entered, then the appraisal of prejudice would begin then.  However, upon inspection, it is apparent that the prospective intervenors' assertion regarding when they became aware of the necessity to intervene is contradicted by plaintiffs' evidence.

/////

---

[4]  "Actual knowledge" includes express and implied knowledge.  Knowledge Definition, Black's Law Dictionary (11th ed. 2019), *available at* Westlaw.  Express knowledge means "[d]irect and clear knowledge," while implied knowledge means "[k]nowledge of information that would lead a reasonable person to inquire further."  *Id.*

[5]  Constructive knowledge is knowledge "that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person."  Knowledge Definition, Black's Law Dictionary (11th ed. 2019), *available at* Westlaw.

[6]  Prospective intervenors here appear to be referring to the date on which the magistrate judge issued findings and recommendation recommending that plaintiff's motion for default judgment be granted.  (Doc. No. 22.)  The motion for default judgement was not granted until October 3, 2019.  (Doc. No. 23.)

First, the court notes that the prospective intervenors have submitted no evidence from any of its representatives attesting that National Union or North Star did not receive any notice regarding this action until September 13, 2019.  What prospective intervenors rely on—though, without clear explanation—is an email from their predecessor Landmark's attorneys sent, on October 17, 2019, to plaintiffs' attorney stating:

> Based on the material we have reviewed, it appears that my clients' first notice of this matter came on September 11, 2019.  I understand that there may have been a prior attempt to contact Landmark on July 7, 2019.  I have seen no record that the July notice was received.

(Doc. No. 29 at 4) (citing Doc. No. 28-16.)  As an initial matter, prospective intervenors reliance on this email evades the legal implication of June 17, 2019 letters sent to them by focusing attention on Landmark's lack of knowledge—as opposed to prospective intervenors' knowledge, nor is it clear why prospective intervenors rely on this email to support their lack of knowledge when the attorney was only speaking on behalf of Landmark.  Stated differently, the email evidence is not probative of whether the prospective intervenors lacked knowledge of this action until September 13, 2019.

In any event, the email is also not admissible evidence, since Landmark's attorney lacked the necessary personal knowledge to make such a factual assertion and failed to make an affirmation under penalty of perjury.  "Under Rule 602, a witness may testify to a matter *only if* evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter"; "[p]ersonal knowledge means knowledge produced by the direct involvement of the senses." *United States v. Lopez*, 762 F.3d 852, 863 (9th Cir. 2014).  The October 17, 2019 email does not indicate how or if Landmark's attorney had personal knowledge about prospective intervenors' lack of awareness of this action until September 13, 2019, as required by Federal Rule of Evidence 602. *See Casey v. Lewis*, 4 F.3d 1516, 1527 (9th Cir. 1993) ("Conclusory affidavits that do not affirmatively show personal knowledge of specific facts are insufficient.").  And it would not be reasonable for the court to infer that an attorney Landmark hired to represent it would have personal knowledge of prospective intervenors' daily incoming mail and claims. *See In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir. 2000) ("Personal knowledge may be inferred

1    from a declarant's position."); *United States v. Joy*, 192 F.3d 761, 767 (7th Cir. 1999) (holding

2    that evidence is inadmissible "only if in the proper exercise of the trial court's discretion it finds

3    that the witness could not have actually perceived or observed that which he testifies to").

4    Equally important, the facts asserted in the email are not sworn testimony made under penalty of

5    perjury, as required by Federal Rule of Evidence 603.  Fed. R. Evid. 603 ("Before testifying, a

6    witness *must* give an oath or affirmation to testify truthfully." (emphasis added)); *United States v.*

7    *Hawkins*, 76 F.3d 545, 551 (4th Cir. 1996) ("[T]estimony taken from a witness who has not given

8    an oath or affirmation to testify truthfully is inadmissible.").  Without admissible evidence to

9    support it, prospective intervenors' assertion about their lack of awareness rings hollow.[7]

10         By contrast, the admissible evidence submitted by plaintiffs establishes that prejudice

11   should be measured starting in June 2019 before the default judgment was entered in this case.

12   On June 17, 2019, plaintiffs sent prospective intervenors letters via certified mail, with return

13   receipt requested, informing them of this case and making a claim on defendant's insurance

14   policy.  (Doc. No. 28-1 at ¶¶ 4, 6) (citing Doc. Nos. 28-2, 28-6.)  The USPS receipts show that

15   prospective intervenor North Star's agent signed for and received this letter on June 20, 2019, and

16   that the second letter was delivered to prospective intervenor National Union on June 21, 2019,

17   though, without a signature from its agent verifying that receipt.  (Doc. Nos. 28-2 at 4; 28-6 at 4).

18   Neither National Union nor North Star disputes the correctness of the addresses to which the June

19   17, 2019 letters were delivered.  Instead, only National Union argues, without citing to any

20   authority, that the USPS receipt for the June 21, 2019 delivery is not sufficient proof of delivery

21   because it was not signed by its agent.  (Doc. Nos. 25 at 6 n.1; 29 at 4.)  There are two critical

22   premises underlying this argument, neither of which is sound.  The first premise is that plaintiffs

23   bear the ultimate burden of proving delivery of the letters.  However, "[t]he party seeking to

24   intervene bears the burden of showing that all the requirements for intervention have been met."

25   *Alisal Water Corp.*, 370 F.3d at 919.  In other words, here, the prospective intervenors bear the

26   /////

27

28   ---
     [7]  The court may take notice on its own of the evidentiary issues discussed above under Federal
     Rules of Evidence 103(e).

1  ultimate burden of persuading the court that the June 17, 2019 letters were not delivered to them

2  contrary to the USPS receipts showing such delivery.

3      The second premise is that the USPS receipts of delivery, even without a signature, are

4  insufficient evidence of delivery.  On this second point, the longstanding common law mailbox

5  rule is instructive.  *See Hagner v. United States*, 285 U.S. 427, 430 (1932) ("The rule is well

6  settled that proof that a letter properly directed was placed in a post office creates a presumption

7  that it reached its destination in usual time and was actually received by the person to whom it

8  was addressed."); *Rosenthal v. Walker*, 111 U.S. 185, 193 (1884) (same).  This common law

9  mailbox rule "provides that the proper and timely *mailing* of a document raises a rebuttable

10 presumption that the document has been received by the addressee in the usual time.  It is a

11 settled feature of the federal common law."[8]  *Schikore v. BankAmerica Supplemental Ret. Plan*,

12 269 F.3d 956, 961 (9th Cir. 2001) (emphasis added).  Simply put, "if a letter properly directed is

13 proved to have been either put into the post-office or delivered to the postman," the rebuttable

14 presumption of receipt is triggered—neither a signature nor even a record of delivery is required.

15 *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 319 (3d Cir. 2014); *accord Kerr v. Charles F.*

16 *Vatterott & Co.*, 184 F.3d 938, 947 (8th Cir. 1999).  The rule is "a tool for determining, in the

17 face of inconclusive evidence, whether or not receipt has actually been accomplished."  *Schikore*,

18 269 F.3d at 961.  "A 'strong presumption' of receipt applies when notice is sent by certified mail,

19 because it creates actual evidence of delivery in the form of a receipt."  *Lupyan*, 761 F.3d at 319;

20 *cf. id.* ("A 'weaker presumption' arises where delivery is sent via regular mail, for which no

21 receipt, or other proof of delivery, is generated.").

22      Applying the mailbox rule here, National Union and North Star are therefore strongly

23 presumed to have received the notices of this action and claims against their insured's policy

24 based on the USPS certified mail receipts showing the delivery of the June 17, 2019 letters.  *E.g.*,

25 *McCall v. Bowen*, 832 F.2d 862, 865 (5th Cir. 1987) (holding that certified mail was "sufficient

26 evidence to support the finding that McCall received the notice promptly after it was mailed"

27

28 [8]  Similarly under California law, "[a] letter correctly addressed and properly mailed is presumed
   to have been *received* in the ordinary course of mail."  Cal. Evid. Code § 641 (emphasis added).

1  under the mailbox rule).  As explained before, neither National Union nor North Star has

2  presented any admissible evidence, let alone sufficient evidence, to rebut this strong presumption

3  of their receipt.  *Cf. Huizar v. Carey*, 273 F.3d 1220, 1223 n.3 (9th Cir. 2001) ("Merely stating

4  that the document isn't in the addressee's files or records—which is all that the state has done in

5  this case—is insufficient to defeat the presumption of receipt."); *Lepre v. Dep't of Labor*, 275

6  F.3d 59, 70 (D.C. Cir. 2001) ("[S]ome courts have concluded that a mere denial of receipt is

7  insufficient to rebut the presumption accorded the sender under the mailbox rule.").  Accordingly,

8  under the common law mailbox rule, prejudice should be measured from June 20 and 21 when

9  prospective intervenors received actual or constructive notice of this action.

10  Prospective intervenor North Star's vice president effectively concedes that his company's

11  agent signed for and received the June 17, 2019 letter.  *See, e.g.*, *Kruska v. Perverted Justice*

12  *Found. Incorporated.org*, No. CV 08-0054-PHX-SMM, 2010 WL 3156089, at *3 (D. Ariz. Aug.

13  9, 2010) (concluding that the defendant "received actual notice of the lawsuit when he signed the

14  certified mailing").  Nonetheless, North Star continues to argue that it "has not received any

15  communication from [defendant] about this lawsuit, the default, or the default judgment."  (Doc.

16  Nos. 27-1 at ¶ 5; 28-6 at 4.)  Prospective intervenor National Union, on the other hand, submits a

17  declaration from its counsel stating that National Union "was not made aware of the default

18  judgment" until October 2, 2019, but in that declaration its counsel says nothing about when

19  National Union knew about this action, as opposed to when it knew of the default judgment.

20  (Doc. 25-1 at ¶¶ 7, 10.)  Rather, National Union contends that it was not given sufficient notice

21  and opportunity to review plaintiffs' claim against its insured before default judgment was

22  entered.  (Doc. No. 25 at 7.)  National Union further argues that its insurance coverage "is not

23  automatically conferred by the filing of the complaint," and that it did not realize defendant was

24  not defending against this case until it learned of the default judgment.  (Doc. No. 29 at 4.)

25  Reduced to its essential, National Union's argument is that as long as it does not know

26  with some level of certainty whether it had a duty to indemnify a defendant for its alleged

27  misconduct under their insurance policy, it had no obligation to seek to intervene—unless it had

28  actual knowledge that defendant's corporate status was in suspension.  *But see, e.g., Garrity v.*

1    *Gallen*, 697 F.2d 452, 456, 458 (1st Cir. 1983) (holding that although prospective intervenors

2    "did not have actual knowledge of their interest," "extensive media coverage of the trial" "should

3    have alerted them to the fact that they had an obvious interest in the outcome of the litigation,"

4    and that their intervention was therefore untimely).  Under National Union's theory, prejudice

5    should be measured from when its duty to indemnify its insured was triggered.  Yet, National

6    Union provides no authority in support of that contention.  Moreover, as explained below,

7    California law is at odds with National Union's theory.

8            First, however, it should be made clear that prospective intervenors have conceded that, as

9    defendant's liability insurers, they "have a clear and unambiguous interest in the disposition of

10    this litigation," (Doc. No. 25 at 7), and now seek to "provide a defense to [defendant] subject to

11    full and complete reservations of rights," (Doc. No. 25-1 at ¶ 12).[9]  Thus, the question is not if but

12    *when* prospective intervenors should have recognized that their interest "*might* be adversely

13    affected by the outcome of litigation," i.e. when their duty to defend defendant was triggered.

14    *Alisal Water Corp.*, 370 F.3d at 923 (emphasis added).

15            Returning to the defect in prospective intervenors' theory, the California Supreme Court

16    has made clear that, "[i]t has long been a fundamental rule of law that an insurer has a duty to

17    defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to

18    the potential for coverage under the insuring agreement."  *Waller v. Truck Ins. Exch., Inc.*, 11 Cal.

19    4th 1, 19 (1995); *see also Albert v. Truck Ins. Exch.*, 23 Cal. App. 5th 367, 377 (2018) (holding

20    that an insurer has "a broad duty to defend its insured against claims that create a potential for

21    indemnity.").  The insurer's duty to defend "applies even to claims that are 'groundless, false, or

22    fraudulent,'" *Waller*, 11 Cal. 4th at 19 (citation omitted); "[u]nresolved factual disputes impacting

23

24    _____

       [9]  Under California law, "an insurer providing a defense, even though subject to a reservation of

25    rights, may intervene in the action" because California Insurance Code § 11580 "provides that a
       judgment creditor may proceed directly against any liability insurance covering the defendant,

26    and obtain satisfaction of the judgment up to the amount of the policy limits."  *Gray v. Begley*,
       182 Cal. App. 4th 1509, 1522–24 (2010).  *But see Hinton v. Beck*, 176 Cal. App. 4th 1378, 1384

27    (2009) ("an insurer who denies coverage *and* refuses to defend its insured does not have a direct
       interest in the litigation between the plaintiff and the insured to warrant intervention." (emphasis

28    added)).

                                                    13

1   insurance coverage do not absolve the insurer of its duty to defend," *Howard v. Am. Nat'l Fire*

2   *Ins. Co.* 187 Cal. App. 4th 498, 520 (2010).  Awareness of an insured defendant's potential

3   liability is usually "made in the first instance by comparing the allegations of the complaint with

4   the terms of the policy." *Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 295 (1993).

5   The June 2019 letters sent by plaintiffs to the prospective intervenors contained the case number

6   and other related information about this action to enable them, with minimal due diligence, to

7   review the complaint filed in this case.  That, in turn, would appear to have triggered their duty to

8   defend, even if the prospective intervenors believed defendant's corporate status was not in

9   suspension.  Thus, prospective intervenors' contention that their duty to defend defendant was not

10  triggered until default judgment was entered against defendant, or until they fully investigated

11  plaintiffs' insurance claim against the defendant insured, is groundless.

12      Federal law mandates prospective intervenors to intervene "as soon as [they] know or has

13  reason to know that [their] interests might be adversely affected by the outcome of the litigation."

14  *Cal. Dept. of Toxic Substances Control v. Commercial Realty Projects, Inc.*, 309 F.3d 1113, 1120

15  (9th Cir. 2002) (quoting *U.S. v. Or.*, 913 F.2d 576, 589 (9th Cir. 1990)).  If this legal obligation is

16  not met, the court must determine "how much prejudice would result from the would-be

17  intervenor's failure to request intervention as soon as he knew or should have known of his

18  interest in the case."  *Smith*, 830 F.3d at 857 (citation omitted).  For the reasons explained above,

19  the court must measure the prejudice to plaintiffs beginning on June 20 and 21, 2019, when the

20  prospective intervenors received plaintiffs' first set of letters, up until the time when the motion to

21  intervene and joinder therein were filed in mid-November 2019.  That span of time reflects

22  almost five months of delay in seeking intervention that could have been avoided by the

23  prospective intervenors.  It follows that if the belated motion to intervene were to now be granted,

24  plaintiffs would lose the time and resources they expended on duly procuring the clerk's entry of

25  default and the default judgment and on having to relitigate this case (or at least as to motion to

26  vacate the entry of default and default judgment prospective intervenors intend to file) with new

27  /////

28  /////

1   parties.[10] *See, e.g.*, *Abels v. Bank of Am., N.A.*, No. 11-CV-208 YGR, 2013 WL 75775, at *5

2   (N.D. Cal. Jan. 4, 2013) (denying a motion to intervene as untimely); *Kremen v. Cohen*, No. 05-

3   CV-01319 JM(POR), 2007 WL 1875779, at *2 (S.D. Cal. June 28, 2007) (denying a motion to

4   intervene because the prospective intervenor engaged in "excessive delay in moving to intervene"

5   and made a "material misrepresentation to the court on the timing issue," even though the motion

6   was brought before default judgment was entered); *Katz v. Berisford Int'l PLC*, No. 96 CIV. 8695

7   (JGK), 2000 WL 1760965, at *1-2 (S.D.N.Y. Nov. 30, 2000) (holding that, in light prospective

8   intervenors' failure to timely seek intervention, there would be "substantial prejudice" to the

9   current parties if the motion to intervene—brought less than two weeks after entry of judgment—

10  were granted); *see also McDonald v. E. J. Lavino Co.*, 430 F.2d 1065, 1074 (5th Cir. 1970)

11  (holding that Rule 24 "was designed to insure that the original parties should not be prejudiced by

12  the intervener's failure to apply sooner"); *cf. Deutsche Bank Nat'l Tr. Co. v. CB Equities LLC*,

13  No. C 15-03809 JSW, 2017 WL 386255, at *3 (N.D. Cal. Jan. 27, 2017) (finding that the motion

14  to intervene was proper, in part, because the motion for summary judgment was still pending).

15  For these reasons, the court finds that the prejudice factor favors plaintiffs.

16        Even if the court were to consider the October 17, 2019 email sent by Landmark's

17  attorney to plaintiffs' attorney, the court would have to make a factual finding as to which version

18  /////

19  /////

20  /////

21

22   [10]  The evidence also shows that plaintiffs sent a claim letter to nonparty NHIC (prospective intervenors' predecessor) on June 17, 2019 informing NHIC of this case. (Doc. No. 28-3 at 2.) A

23  month later, NHIC responded by asking plaintiffs for additional information regarding the insurance policy. (Doc. No. 28-4 at 2.) Based on this, plaintiffs seek to impute NHIC's

24  knowledge of this action to prospective intervenor. (Doc. No. 28 at 3.) However, NHIC is not seeking to intervene here, and there is no evidence to suggest that the court should consider NHIC

25  as the same entity as either National Union or North Star. *See Ranza v. Nike, Inc.*, 793 F.3d 1059, 1070–71 (9th Cir. 2015) ("'A basic tenet of American corporate law is that the corporation and its

26  shareholders are distinct entities.' As a general principle, corporate separateness insulates a parent corporation from liability created by its subsidiary, notwithstanding the parent's ownership

27  of the subsidiary." (citations omitted)). Importantly, there is no evidence to impute NHIC's knowledge onto either National Union or North Star. Therefore, the court is unpersuaded by this

28  argument advanced by plaintiffs.

1    of the facts—prospective intervenors' or plaintiffs'—is more believable.[11]   In this regard, the

2    Ninth Circuit has explained the difficulty of conclusively proving or disproving the receipt of a

3    mailed document:

4    
5    
6    
7    

> Non-receipt is difficult to prove conclusively.  All that a party seeking to demonstrate non-receipt can normally do is to submit affidavits regarding the usual practice of opening mail and actions consistent with non-receipt and an intent to file an appeal. . . . Similarly, actual receipt is difficult to show without using certified mail.

8    *Nunley*, 52 F.3d at 796.  "When a movant specifically denies receipt of notice, a district judge

9    must then weigh the evidence and make a considered factual determination concerning receipt,

10   rather than denying the motion out of hand based upon proof of mailing."  *Id.*  "Regardless of the

11   quantum of evidence necessary to rebut the presumption, the movant still bears the burden of

12   proving non-receipt."  *Id.* at 796–97.

13         Here, the totality of the circumstances guides the court's factual determination in

14   plaintiffs' favor.  *R & G Mortg. Corp.*, 584 F.3d at 7 ("The timeliness inquiry is inherently fact-

15   sensitive and depends on the totality of the circumstances.").  Most significantly, prospective

16   intervenors do not dispute the correctness of the addresses to which the June 17, 2019 letters were

17   sent, and these letters were not returned to plaintiffs—unlike the June 17, 2019 letter sent to

18   Landmark that was returned as undeliverable.  These circumstantial facts persuade the court that

19   it is more likely than not that prospective intervenors knew or should have known about their

20   interests in this action from the June 17, 2019 letters sent to them by plaintiffs.

21               c.    *Reason for and Length of Delay*

22         The final factor to be considered in assessing the timeliness of a motion to intervene is the

23   prospective intervenors' reason for and length of their delay.  *See Smith*, 830 F.3d at 854.  While

24   "[a] failure to realize that one's interests are in jeopardy until very late in the proceedings may

25   make a late motion to intervene 'timely,'" *United States v. State of Wash.*, 86 F.3d 1499, 1506

26   

27   [11]  The court considers this alternative theory only with respect to National Union, given that
     there is undisputed evidence before the court that North Star's agent signed for and received the
28   June 17, 2019 letter.  (*See* Doc. No. 28-6 at 4.)

1    (9th Cir. 1996), "[c]ourts generally have been reluctant to allow intervention when the applicant

2    appears to have been aware of the litigation but has delayed unduly seeking to intervene," *Wilson*,

3    131 F.3d at 1304 (citation omitted).  "[T]he risks of waiting include[ ] possible denial of their

4    motions to intervene as untimely."  *Cal. Dep't of Toxic Substances Control v. Commercial Realty*

5    *Projects, Inc.*, 309 F.3d 1113, 1120 (9th Cir. 2002); *see also Alaniz v. Tillie Lewis Foods*, 572

6    F.2d 657, 659 (9th Cir. 1978) ("The crux of appellants' argument is that they did not know the

7    settlement decree would be to their detriment.  But surely they knew the risks.  To protect their

8    interests, appellants should have joined the negotiations before the suit was settled.").

9         The same analysis applies to consideration of this factor as to those addressed above.

10   Prospective intervenors length of delay is approximately five months after they knew or should

11   have known their interest in this action.  Yet, they offer no reason for the delay in moving to

12   intervene, except for their claim that they were not aware of this action until the issuance of the

13   findings and recommendations recommending the entry of default judgment.  Above, the court

14   has found this explanation to be unsupported.  Thus, prospective intervenors' reason for and the

15   length of their delay do not compel the granting of their belated motion to intervene.  *See, e.g.*,

16   *Penn-Star Ins. Co. v. Maint. Asset Mgmt. Inc.*, No. 17-CV-5047 (NGG) (ST), 2019 WL 4667714,

17   at *3-8 (E.D.N.Y. Sept. 25, 2019) (holding that a motion to intervene was untimely because it

18   was brought seven months after the moving nonparty should have recognized its interest in the

19   action); *FDIC v. Lewis*, No. 2:10-CV-439-JCM-VCF, 2015 WL 9462084, at *1 (D. Nev. Dec. 28,

20   2015) (finding a motion to intervene to be untimely, in part, because moving nonparty "offers no

21   explanation why it waited until a writ of execution was recorded"); *Martinez v. Astrue*, No. C 08-

22   4735 CW, 2014 WL 5408412, at *1 (N.D. Cal. Oct. 22, 2014) (finding untimeliness because the

23   moving nonparty offered no reason why the motion to intervene was brought five years after

24   judgment had been entered).

25        In summary, consideration of all three factors of the timeliness element weigh against

26   granting the movants' intervention as of right under Rule 24(a).  *See, e.g.*, *R & G Mortg. Corp.*,

27   584 F.3d at 8-10 (affirming the district court's denial of a motion to intervene that was unduly

28   filed two and a half months late); *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v.*

1    *Cal.*, No. CIVS-04-2265-FCD-KJM, 2009 WL 1578398, at *3 (E.D. Cal. June 3, 2009) (because

2    some motions to intervene were filed before the hearings on certain dispositive motions and some

3    were filed two months after those hearings, the court found that all of the motions to intervene

4    were untimely).  As the Ninth Circuit has concluded:  "Failure to satisfy any one of the

5    requirements [for intervention] is fatal to the application, and we need not reach the remaining

6    elements if one of the elements is not satisfied."  *Perry v. Schwarzenegger*, 630 F.3d 898, 903

7    (9th Cir. 2011) (alteration in original) (citation omitted) (quoting *Perry v. Proposition 8 Official*

8    *Proponents*, 587 F.3d 947, 950 (9th Cir. 2009)).  The court therefore need not address the

9    remaining elements which must be shown for intervention, and prospective intervenors' request

10    to intervene as of right will be denied.  *See, e.g.*, *CE Design Ltd. v. King Supply Co.*, 791 F.3d

11    722, 726 (7th Cir. 2015) ("The insurers' motion to intervene in the federal litigation was untimely

12    and therefore rightly denied.")

13    **B.**      **Request for Permissive Intervention**

14       "Because timeliness is analyzed even more strictly for a motion for permissive

15    intervention" than intervention as of right, an "alternative request for permissive intervention is

16    necessarily untimely" when movant fails to satisfy the timeliness element for intervention as of

17    right.  *Stadnicki on Behalf of LendingClub Corp. v. Laplanche*, No. 18-16908, 2020 WL 901860,

18    at *2 (9th Cir. Feb. 25, 2020) (citation omitted)).[12]  Here, prospective intervenors have failed to

19    establish their entitlement to intervention as of right under a more lenient standard relating to

20    timeliness and, therefore, their request for permissive intervention must be denied as untimely as

21    well.

22    /////

23    /////

24    /////

25    /////

26    /////

27

28

---

[12]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

Because the prospective intervenors did not timely seek intervention, National Union's motion to intervene (Doc. No. 25), in which North Star joined (Doc. No. 27), is denied.

IT IS SO ORDERED.

Dated:   __**May 19, 2020**__

_____
UNITED STATES DISTRICT JUDGE

19